1-1830 Eastern Missouri Sarah Molina et al. versus Daniel Book et al. Okay and Mr. Wheaton. May it please the court. Good afternoon your honors. My name is Andrew Wheaton. I'm an associate city counselor with the City of St. Louis and in this case I represent five defendant St. Louis police officers and two defendant St. Louis police supervisors who on August 19th 2015 were responsible for dispersing an unlawful assembly that first appeared in the area of Page and Walton in the City of St. Louis. Now any analysis of probable cause and qualified immunity in this case has to recognize as a critical fact that it's undisputed in this case that between at least 7 o'clock and 7 15 p.m. on this evening plaintiffs Sarah Molina and Christina Vogel were assembled with a group of people near the intersection of Page and Walton some of whom were throwing objects at and assaulting police officers at that location. There was probable cause to believe at the very least from... Oh Mr. Wheaton you've which is codified in section 574.060 so... Now wait a second. Did you say they violated the dispersal? They had walked a good distance away. Tell me how they violated? I was initially talking about between the time of 7 o'clock and 7 15 p.m. at which time... Oh you're not to 7 24-ish. I'm not there yet. Okay proceed. I thought you were at 7 24-ish. Go ahead. No no problem your honor. So I'll move on to... The court is no doubt familiar generally with the record in this case having reviewed it but there were multiple dispersal orders given between 7 o'clock and 7 15. They included warnings about the use of chemical munitions. It's undisputed that these two appellants ignored those dispersal orders and therefore at least at that time refused to disperse unlawfully. Ultimately police were forced to deploy inert smoke which pushed this group back one block to the intersection of Bayard and Page and then thereafter when tear gas was ultimately deployed after yet another warning and another warning about the use of chemical munitions this group was pushed west one block further to the intersection of Page and Euclid and it's at that location that at vehicle that some of the appellants run from south of page on Euclid at approximately 7 16 p.m. which is approximately where two of the appellants alleged they were unlawfully exposed to tear gas minutes later so at 7 16 how far have they walked I can't quite tell I even know this area a little bit but how far have they really walked from let's say page and Walton how far 900 actually got go ahead so it's 900 feet from page and Walton to page and Euclid now the wrinkle in this case is that Moline and vocal according to their testimony were pushed west by another route so they weren't actually at page and Euclid at the time that people were throwing rocks and bricks they went south and proceeded through an alley after going south on Bayard so then they arrived at page and Euclid but by the time they had the police had retreated to give yet another dispersal warning and when they came back they had at least arguable pros probable cause and we believe probable cause to believe that those who apparently remained assembled south of page on Euclid had refused to disperse so it's the appellants don't we have to take into account and you know Croatia don't we have to take into account the videos here of how calm that area is well your honor the videos are important and yes the videos must be taken into account so as you know we're making an alternative argument in this case and the first is that the video that which is referred to as the Demian video in this case does reflect a calm scene without any deployments as the bear is turning south on Euclid and so is the defendants position that under Scott versus Harris that the court should find that the lack of the sound at least of deployment of a chemical munition as the bear turned south on Euclid establishes that none was deployed at that time as alleged by the plaintiffs so we make this alternative argument however that taking Molina and Vogel's stories is true notwithstanding the video assuming that there were between 8 and 15 and as many as 20 people assembled south of page on Euclid at that time that the appellant officers could reasonably have believed hey we were just assaulted at this location we retreated for a matter of minutes to give another dispersal order and when we return there's still a group of people assembled here and we are lawfully entitled to take reasonable police action to disperse them at this time well let me ask you this how far away were were these two individuals from the folks that were still causing trouble wasn't there a good distance between them this gets back to the 724 question I think that judge Benton was asking are you asking about it approximately 726 when the yeah when the tear gas was was was you know was deployed right so it's unknown how far away they were from it of course this is record and the light most favorably to the planets as we must but it's unknown how far any of the individuals that actually had been throwing rocks and bricks minutes earlier were you know the reason why I asked that is because the district court I think has a line in there in the opinion and we have to take those as given that says something like where they were these plaintiffs were there was no protest or anything else taking place something along those lines and I'm just wondering if if that's true if you know we're talking about 10 feet away if we're talking about a hundred I just don't know the answer to that I'm looking for guidance sure well it appears to be a reasonable conclusion from the record that after the police retreated that those that had been throwing rocks and bricks dispersed into the alleys to the side of page and Euclid and in the meantime the plaintiffs walked to that location and so when the police came back they apparently mistakenly believed that this group that was assembled here had been part of the group that had been assaulting them minutes earlier so that's the crux of the case here your honor is that when they came back to that location and came upon at least 8 to 15 people assembled at that location where they had just been assaulted that they could reasonably conclude that there's probable cause to believe this group at this location has still refused to disperse and there's no clarity as far as the the appellants are concerned regarding what it means to disperse in this context sufficient to preclude any further police action and efforts to disperse a group like this one there any relevance to the fact that as I recall from the record we have a lot of qualified immunity cases this week so pardon me if I get this wrong but I think for one of the plaintiffs she was actually at home this was like her front porch or front lawn or something like that yes and I gotta say you know I'd be pretty upset even if there's a protest going nearby if I'm standing out of my front lawn with my friends and tear gas is deployed and you know I'm just having a you know having a beer and having a good time so I'm just trying to figure out if there's any any significance to the fact that this is that this is this is on her front lawn not not for purposes of qualified immunity your honor because the officers don't know that she owns that property all they know is there's a group of people standing on the sidewalk in front of a house where we had just been individuals throwing rocks and bricks at us so purposes for purposes of qualified immunity it's relevant you're correct that miss Molina did own that property it was I believe she I believe she purchased it from the city LRA Authority and they were standing on the sidewalk in front of that property at the time I want to point out and I want to make sure this is clear that according to miss Vogel's testimony there were other groups on the street at that time and it was her testimony that others were subjected to tear gas too and that tear gas was deployed at others so that's important because Molina and Vogel therefore were not singled out as required by this court's precedent under Koresh how about gross or grossie however we say it he was singled out well right for cursing at the police so that gets us to the to the the appellant's assertion that if the use of force is objectively reasonable period then no First Amendment claim can survive or at least arguably so so in this case mr. gross follows the bear as it sounds like you know judge down the street after he was in the area when that dispersal order was given and then he follows the you put as it turns out his house is in that direction but of course the officers didn't know that and yeah he did say get get out of my park where they turned at Fountain Park so you presume he's in that area go ahead he did say with the addition of an expletive to get out of the park but that use of that profanity in the expletive and he the furthest that mr. gross went was to admit that he was agitated and conveyed his irritation or agitation I can't remember what she said at this moment to the officers on the bear but given this tense situation and that the officers had been engaged in trying to disperse an unlawful assembly where it's undisputed that multiple individuals that they had thrown rocks and bricks at that vehicle they could have even if mistakenly believe that mr. gross posed them a threat to their safety that you counsel isn't this clearly a credibility because the officers say they didn't launch any project letting he says they did and they hit him this is why we have courts right well your honor I think we I agree that's why we have we have courts so yes however mr. the undisputed testimony here is that mr. gross came within feet of a tactical vehicle engaged in attempting to disperse an unlawful assembly and at the time said I hit the F out of my park officers under those circumstances could believe for tactical reasons that it's unsafe for him to get close to that vehicle and that they were justifying using force to disperse I mean you're with the tolan v cotton case of the United States Supreme Court I'm sorry your honor it's credibility in these kind of cases we believe the plaintiff well and maybe I'm issue because we're taking what mr. gross said is undisputed and so you did launch it so that means you launched a project to let him he says you launched a project let him right what I meant was we're taking that he said get the F out of my park is understood yeah but you've also got to take because he says you launched a project be ready and it hit him well I'm in the hip go ahead and I'm not sure that his testimony is clear on that point and we do make the argument that as a matter of law there's not sufficient admissible evidence to from a projectile by the bear at that time his own testimony what what is there besides his own testimony well your honor I'm just referring to the fact that he didn't know where the projectile came from he couldn't say that anyone from the bear actually shot him he assumed that they did and his testimony was vague to say the least and almost bizarre and it's inability to identify where this projectile came from or this purported projectile so in any event assuming that there was one which which is an argument that again we make in the alternative it's the appellant's position that that use of force was objectively reasonable and at least they're entitled to qualified immunity and that they did not violate clearly established law of which a reasonable officer would have known at this time I have a I have a 10,000 foot question I'm apologize if I'm eating into your rebuttal but some of this activity is clearly First Amendment I think there is there obviously a peaceful protest is First Amendment activity but I don't think that throwing rocks and bottles is a form of speech or expressive activity that's covered by the US Supreme Court so I'm trying to figure out on a 10,000 foot level whether this is really a viable first First Amendment retaliation claim at all and I know you don't argue that but I just wanted to give you a chance to respond and I'm gonna give opposing counsel a chance to respond as well sure and I agree with you your honor that that's not protected First Amendment activity pursuant to Supreme Court precedent and that that undercuts the plaintiff's claim in this case so I'm sorry if there was another part of your question no I'm just trying to figure out what to do with that because it doesn't appear that that's been argued I don't think you make that argument so maybe I'm maybe I'm just you know whistling in the wind so to speak but but I'm you know what do I do with that if anything how does it affect the case so there is a reference in the reply brief that that this is akin to fighting words and not protected First So I think that argument is included in the briefing before the court and if I could I'll reserve the remainder of my time for rebuttal. You may, Ms. Stafford. Good afternoon and may it please the court. A lot of what you just heard described as undisputed is actually vigorously disputed by competent evidence in the record. For example, the plaintiff's evidence is not that there were you know some 20 people on the block of Euclid south of Page that were throwing rocks and bricks but there were in fact just a few pedestrians who were doing nothing unlawful and were not engaged with police at all. Was the testimony several others or you said few. Is the testimony several others? Am I right about the testimony? Yes, that's correct, your honor. So the the biggest number given by any of the plaintiffs during their sworn testimony is about 10 people on that block which from between Page and Euclid to Miss Molina's property is 550 feet. So you heard the officers counsel sort of conflate the area where according to their evidence some people were throwing bricks and rocks with the place where the plaintiffs were right which is 550 feet south bigger than a football field south. So if you take the disputed facts in the plaintiff's favor as the court must, there's nothing uncertain about what happened. The police shot a projectile at peaceful people who were standing as the court noted on a quiet residential sidewalk. Police did so because they thought they had participated in the protest and they shot a projectile at Mr. Gross who was a single pedestrian in a park because he made a verbal criticism of the police. These plaintiffs were 1,500 feet away from the protest site in the direction that the police had told them to go in these dispersal orders given at Page and Walton. Well let me ask you this, on the former where we got expletives lodged at the police, that is clearly First Amendment activity. You can you can lodge as many expletives at the police as you want and we have a retaliation claim there. What I can't figure out is where the First Amendment retaliation claim comes in with respect to the others because you have a violent protest elsewhere and then they're standing on the front porch. So I'm just trying to figure out what First Amendment activity the other plaintiffs were engaged in. Yes your honor, I think that's an important point. So the the two plaintiffs here, Ms. Molina and Ms. Vogel, who were legal observers trained by the National Lawyers Guild, were wearing these neon green, lime green hats that were very visible, visible in police video that is part of this record and that several of the police officers who were present on the bear recognized as people who attend protests. So that is the point of a legal observer is to go to a protest no matter what people are protesting in order to ensure that First Amendment rights are protected at that both of the supervisors recognizing that the lime green hats indicate that somebody had participated in a protest. You're not getting me there though because because observing a protest is not itself First Amendment activity. They actually have to be engaged in the protest for there to be retaliation against them under the First Amendment. So respectfully, your honor, I would disagree. I think the legal observers here are in a similar situation to the reporters in Karachi who they were not you know engaged in the the protest of the police conduct like the protesters were in Ferguson, but they were there to ensure that those people's First Amendment rights were protected by recording police conduct in public. That is what they were doing. But there you have an independent, there you have an independent protection in the First Amendment, the freedom of the press, and and I don't think you have, there's no freedom for lawyers to go observe protests or watch people engage in First Amendment activity. Respectfully, your honor, I would disagree. I think that the rights of citizens under the First Amendment are coextensive with the First Amendment. I think the Supreme Court has has implied that at least in the Brasenburg case, Brasenburg v. Hayes, that if you are, if you are, what did what did your client say? Excuse me, your honor? What did they say? S-A-Y say? What did they say? To the officers? I don't know. I I I'm like Judge Strauss. I'm having trouble finding out what they said. Yeah, what the First Amendment activity is. I think there there are many cases in this circuit and outside of this circuit that recognize that people, citizens, have a First Amendment right to observe and record police conduct in public. So that is what they were doing when they were then when they were at the initial protest at Page and Walton. There are videos in the record from Ms. Vogel who was recording the police, you know, use of tear gas in Fountain Park. Well, let me ask you this. Let's say there's somebody across the street, not there as a legal observer, somebody across the street, they say, oh my gosh, look what's happening across the street. And they pull out their phone and they start videotaping it. And then a tear gas canister comes whizzing by their head. There's really no First Amendment activity there. Would we say that that's First Amendment retaliation or retaliation in response to their first? And I don't see how this case is different. Let me say this, your honor. So when you bring up First Amendment retaliatory use of force claim right there, there's three elements. You have to prove that there was an adverse action in here. That was the launch of the chemical condition. You also have to prove causation, right? You have to prove that it was motivated by the plaintiff's First Amendment activity. And that's, I think, what we have here because of these neon green hats that the officers were familiar with and knew what they signified. There's no state law or even a city municipal ordinance about these green hats or any of this stuff, right? No, your honor. I think it's more about what the officer, you know, you take what the officers, a reasonable officer would have known at the time. And we have the officer's testimony that they knew what these hats meant. And so that, I think, is a question about the sufficiency of the evidence. It's a question about, it's a question of fact that should be determined by a fact finder in the first instance. Let me just add one follow up question quickly, which is, is there any evidence in the record that these plaintiffs, other than wearing their green hat, said anything? That they said anything or protest anything? Or is the only evidence they were recording it and watching other people protest? Your honor, there is a video in the record taken by Ms. Vogel in which she narrates what the police conduct is behind her. She says, as you can see, there are, you know, the police are deploying chemical munitions in Fountain Park. That's happening behind me. So I think that is part of her expressive conduct. I also think these two plaintiffs have an independent First Instance in the briefing because they are, you know, gathered on a public sidewalk, engaged in that kind of protected conduct when they are, you know, the police launch munitions at them. And both the hats and the, you know, gathering on the sidewalk are the kinds of facts that should be given to a fact finder in the first instance. Well, counsel, the green hats, I mean, that's really irrelevant, isn't it? I don't think they were there to observe. They were there to observe a protest just like any other bystander. They happen to be lawyers. But so what if they were wearing green hats? How does that distinguish them or separate them from any other interested bystander? You know, in the world today, everybody has their phone and everybody starts recording when something takes place. So do we even need to be concerned about the green hats and the legal observer concept? Your Honor, I think that the significance of the green hats is not to say that those plaintiffs have a First Amendment right that's any different from any other person. What it is is to show that they were clearly identified by the officers. The officers were aware that a person who was wearing a green hat was a person who had just participated in a protest. And you'll see from the officer's testimony, they don't distinguish a legal observer from an active protester. To them, it just meant this is a person who goes to protests. So in that way, the significance is that it fed into the officer's motive. And as this court has said repeatedly, motive is exactly the kind of factual question that unless it's absolutely clear, it ought to be committed to a fact finder in the first instance. And that's what the district court properly held here. Well, Counselor, your time is flying by. I didn't see that the district court considered Lieutenant Dodge, who has very little involvement here. I didn't see that the district court specifically considered him. If we don't do anything else, why shouldn't he win? Your Honor, I think the evidence in demonstrating that Lieutenant Dodge had personal involvement here is very strong. Well, first of all, I'm sorry, I have a suppressed question. The district court doesn't address them individually, right? It does not go through each person individually. Yes, that's correct. Okay. Now, what do we have on Dodge that's anything at all? Go ahead. So, Your Honor, I think there are a couple of things that pertain specifically to Lieutenant Dodge, and then I'll talk about the other officers as well. So, for Lieutenant Dodge, you have his sworn testimony that he personally ordered this patrol south of Euclid on Page, and that he personally ordered the people in the bear to deploy munitions to disperse the crowd, and that all of the people in that bear were reporting to him. So, we cite a couple of cases in the brief, including two 11th Circuit cases, one called where plaintiffs sued police supervisors that they said had ordered a particular deployment of chemical munitions, and the court agrees that that is sufficient personal involvement, assuming it can be proved, to demonstrate a First Amendment retaliatory use of force case claim. Well, we looked at several of your references to what you're saying about Dodge, and we don't find them at least on the pages that you cite in the joint appendix, and I'm very suspicious that this is just like the person at police headquarters who signed some general order that you'll police a certain part of town. I think that that's the analogy to Dodge, and there's almost nothing on Dodge. So, tell me what there is. I want to make a distinction, Your Honor, between somebody who, you know, sort of somewhere else, and somebody who was part of the incident at the time. Dodge was there, right? He was at Page and Walton. He supervised- He left, and he's not with this bear, right? That is correct. He's not with the bear. Yeah, correct. He was in the other armored vehicle. Right, right. That's true. He didn't know what they were going to do once they left. They might have done nothing. They might have stopped and had coffee or something. I take your point, Your Honor. I think that his instructions that he acknowledged in his deposition were specific enough that this outcome was foreseeable. I'm glad, though, that you raised the evidence about the officers and their specific personal involvement, because I want to go through what that evidence is. Our evidence, of course, is that this small group of officers was, with the exception of Dodge, present in the bear at this specific time in this specific place on Euclid, south of Page, that they had been trained on chemical munitions, although not when to use them exactly. They had access to the munitions. They had access to the launcher. They had the means to launch them toward the plaintiff's location. Munitions are launchable through the porthole on the bear on the plaintiff's side. In addition to that, we also have the police's own words. We have the police report written by a member of the SWAT team contemporaneously that specifically names officers Book, Busseau, and Mader as having deployed munitions on this block, and officers Webbington, Sieper, and Coates as having done so on this little circuit. Now, the report says three of them did it, though, right? Names three of them. That's correct. Yeah, name three of them. What do you have beyond that? Go ahead. So the other three are named as having deployed munitions just on that block, or I'm sorry, on that circuit, you know, from going west on Page and then south on Euclid and then back around north again. And we have the testimony from Officer Manasco and from Lieutenant Dodge that perhaps not every munitions location was quite accurately recorded. And so that kind of question is a question about the sufficiency of the evidence, about in which a fact finder has to weigh the credibility of each individual testifier and determine whom they believe and what there is to show the liability here. Counsel, on the sort of arguable, probable cause, clearly established point, help me with White v. Jackson, 865 F. 3rd, 1064. That's the Ferguson ones. And in particular, that the officers could have reasonably concluded that the individuals were cognizant of other members doing unlawful acts. And that could be good enough by not disassociating themselves. Why is this case distinguishable from White? There are many reasons, Your Honor. One is that these people are much farther away than the plaintiff was in White v. Jackson, 10 times as far away, around the corner. And they followed the instructions of the police. They dispersed in the direction that the police had told them to go. So they certainly had disassociated themselves from whatever activity was happening at Page and Walton. Second, the court said in Qureshi, I mean, at best, if you take the defendant's facts as true, at best, there was a mistake of fact here about arguable, probable cause. And as the court is familiar with and said in Qureshi, mistake of fact can't be used to support a determination of arguable, probable cause. So I don't think there was arguable, probable cause here. But I also don't think we have to show it, because the court has recognized two distinct First Amendment retaliation claims. In a context like this, there's a retaliatory arrest claim, in which we would, of course, agree that you do have to show the absence of probable cause, but also a retaliatory use of force claim, in which this court has, in Peterson and in Qureshi, held that you do not need to show a probable cause in order to bring such a claim. Okay. And counsel, I bet you want to reserve some time for revising. I'll just conclude, Your Honor, that there may be gray areas in protest cases, but this is not a gray area. These incidents were a long way away from the protest. Qualifying immunity was properly denied, and the district court decision should be affirmed, whether on jurisdictional grounds or reaching the full determination of the many disputed facts at a trial. Thank you. Thank you. Mr. Wheaton, are you still with us? Yes, you are. So, Mr. Wheaton, you have a short time for rebuttal. Thank you, Your Honor. I'll begin with the clearly established prong of the qualified immunity analysis, and note that the district court in this case relied almost exclusively on Qureshi in denying qualified immunity here, but that case was decided almost six years after the incidents at issue in this case, and so cannot have clearly established law on August 19, 2015. So, in that respect, the district court's analysis was seriously deficient on the clearly established prong of the analysis. And I completely agree with Judge Strasse's observation regarding White v. Jackson and disassociating from an unlawful assembly. And in this case, qualified immunity attaches unless the Bernini v. St. Paul is far closer to the facts at issue in this case than anything cited by the plaintiffs. The officers could not have known exactly what it meant to disperse in this case and whether the plaintiffs had. The appellees quibble about what does it mean to disperse, but the definition says what it says, which is to break apart, in other words, to disassociate from the group as this court held in White v. Jackson. And on the subjective motive issue, I'll just say that Nieves v. Bartlett forecloses that the appellee's urging to move directly to subjective motivation and intent, where there's an objectively reasonable use of force or arguable probable cause, a retaliatory use of force claim necessarily failed. Thank you. Okay, thank you both for your arguments. Case number 21-1830 is submitted for decision by the court.